2-17-0940 Robert McCormick Foundation and Pantene Foundation plaintiffs' appellants, the Arthur J. Gallagher Risk Management Services Incorporated Defendant's Affiliate. Arguing on behalf of the plaintiffs' appellants, Mr. David E. Schofield. Arguing on behalf of the Defendant's Affiliate, Mr. Michael T. Reagan. Thank you, Your Honor, and may it please the Court. The Robert R. McCormick and Pantene Charitable Foundations brought this malpractice and negligence action to recover the value of insurance coverage that their broker, Arthur J. Gallagher, failed to procure on their behalf. Gallagher's negligence has forced the Foundations to fend for themselves against a massive lawsuit filed in federal court in New York City against them and thousands of other former shareholders of Tribune Company. The Foundations respectfully appeal today to two erroneous rulings by the Circuit Court. First, the Circuit Court abused its discretion by refusing to stay this ancillary action. Despite Gallagher's admission that it intends to discover and try the same allegations as the Foundations' knowledge and intent that the trustee in the underlying Tribune LBL litigation is pursuing. And despite the Circuit Court's own acknowledgment that it should not permit trial of those allegations in this matter before the underlying case is resolved. Well, that being said, this has gone on for eight years, give or take? It has. And there has to be some movement. Why can't there be discovery pending and going forward? Because I don't expect it's going to be small. And get ready in the event that that litigation in New York settles or resolves itself. Certainly. We have sought a path forward that would permit that. We sought it in several ways. In fact, we offered a stay of this case initially to Gallagher to avoid any dispute over this, and they declined that. We also sought summary judgment in the trial court to try to establish, which we think we can establish, that the defenses that give rise to this knowledge and intent discovery, which is prejudicial to the Foundations, is not needed because the defenses on which it's sought are not valid under established law. May I ask a question? Certainly. Why did the Foundations submit the claim to Chubb? The Foundations were not – the claim did not come in on Chubb's. Some of the conduct alleged occurred during that coverage period, correct? The conduct alleged actually occurred prior to that. But it's a claims-made policy, and so the claim has to be submitted to the insurer who is on the risk when the claim comes in. That was Chubb's and not Chubb. Isn't there a risk that the evidence will become stale? Witnesses will become unavailable if this case doesn't move ahead now? The issues that are most troublesome to the defense of the Foundations case and the underlying action are heavily document-intensive. And that material is already being discovered and developed in the underlying case. To the extent that there are even witness memories are essential. That is also being developed in the underlying case. And so that information will be developed and preserved in that case to the extent that it's even relevant to this case. And while we're at that case versus this case, does this record reflect how much has actually been spent on defense costs in the underlying matters? I do not believe the record reflects it, but it's – I can provide that information, but it's many millions of dollars. Is it in excess of $25 million? It's not in excess of $25 million. Okay. That is a distinct possibility, however. And, you know, one of the things I think is significant here is that the defense of this case may well consume the entire limits of the policy and lives in a situation where the underlying – the defenses related to the underlying indemnity claim may be irrelevant. And yet that's what we're here disputing. Why aren't the interests aligned in that Gallagher may ultimately bear the burden of payment of these underlying claims? There are a number of reasons why the interests are not aligned. The first of those is contractual. Ordinarily, this relates to the waste management case. And in an insurance case, which is where this doctrine arises, the policyholder or the insurer agrees to indemnify for the policyholder's liabilities. That's not the case here. The indemnity provision here only relates to Gallagher's negligence, the cost of Gallagher's negligence. So it's only Gallagher's negligence that creates any interest in this at all. But the real problem here is not – is the misalignment of their interests. And I think it relates to Justice Hutchinson's question a moment ago. That is that the entire value of this policy may be eroded by defense, leaving no indemnity to be defended, whereas the foundation's exposure in the underlying case is massively larger than even the limits of these policies. And so from Gallagher's standpoint, there may be no reason not to pursue these issues, no matter what effect they have on Gallagher's – on the foundation's interest in the underlying case. But isn't there some – I mean, there is some certain concern on Gallagher's part, or should be, that this case does not get totally out of hand and that they don't even have to get up to the $25 million if this is how this pans out. So there – they would like – it would seem that you both are in a position where you would like the underlying matters to be resolved. It's an almost coincidental alignment because of the mismatch of the values, but also most importantly because – because the waste management doctrine is an insurance doctrine, there are a number of things about insurance policies that essentially police the conduct in discovery – in the discovery that's sought here. There are good faith obligations. So, for example, an insurer in Gallagher's position would never think of pursuing this discovery because it would expose its insurer to excess liability that would exceed the limits of the policy. That's not the case here. Gallagher disclaims all of its obligations. Unless – unless it is, in fact, our insurer, it doesn't have those obligations. They could be imposed or they could be – they could be set by order of a court that productive – I mean, I'll get it in a minute. It's too early for me to – I mean, a court could impose many restrictions on an order that would protect – thank you. When I said it, I knew – that would protect this information. Well, I think there are two – I have two comments on that. One is, yes, I think if the court were to read literally its statement that Gallagher is the insurer for the foundations, that Gallagher has breached that insurance obligation in numerous ways, and this discovery would breach it in a very serious way. Well, how? I mean, I'm just not sure how. Because it would expose its insurer to potential liability substantially in excess of the limits of their coverage. Well, what are they – what are you saying they would do with it? Well, what I'm – my – our concern is that it would be disclosed to other parties. And we've cited cases in our brief with respect to the protective order question, for example, in which Federal courts have explained that issues of comedy and federalism that ordinarily would hit – would lead a court to respect a protective order issue in another case are very limited – are limited doctrines. And there is no reason why a court sitting in New York has to – has to respect a protective order issue in this court or in the circuit court. And so as a consequence – So you – how would that happen? Would they have – a court would have to find that the common interest doctrine does not apply? A court could find that or it could find – By disclosing it to Gallagher, the privilege is weighed. A court – a court could – a court could find that the disclosure weighed the privilege and – Or that the material was not privileged under Illinois law. It could misread the waste management doctrine. Well, they can't do that. The Illinois Supreme Court – they cannot overrule the Illinois Supreme Court. But the federal court cannot overrule state courts. Well, those – agree, agree. But they could – they could interpret the court's – the circuit court's application of waste management as a finding that these materials are not privileged. Remember that there's a – waste management is a very unusual doctrine. No other court's adopted it. And so a court sitting in New York, unfamiliar with that doctrine, could look at this ruling and say this was not – it's affecting the ruling that this material is not privileged. Aren't the federal circuits on board with the general waste management provisions? I think that the Seventh Circuit has applied it. But to say they're on board, I think, would be an overstatement. I think most courts – no other court's adopted it as their own principle. Well, but I'm talking about application. You know, the Illinois Supreme Court has spoken back in 2009 or – no, 1999 or – and it's – they've spoken. Why – I'm not suggesting – Have you shown me any case where it has not been followed? I'm not suggesting that a court would not follow. My concern is that it would overread this Court's – the Supreme Court's application to conclude that this material was not privileged or that the – you know, the disclosure of it in this case, because arguably it was at issue or something of that nature, would eliminate the protection, the 35 privilege, and permit its disclosure in the federal action. Was there any attempt to work with Gallagher to craft a meaningful protective order? We've worked on a protective order, but our concern is not the terms of the protective order, but the degree to which a court outside of Illinois, outside of the state system, would respect that order, no matter what we say. In fact, some of the cases we cited noted that negotiated protective orders are effectively an agreement, not an order of the court, and therefore not entitled to protection. So the more we work with them, the closer we work with them, the more it feeds into these cases that have disregarded protective orders because they're effectively an agreement and not a court order. In the waste management, our Supreme Court anticipated that the common interest doctrine would be applied in cases where the parties were adversarial in nature, and that's the case here. That's true, but those would be cases in which the parties were an insurer and its policyholder, particularly with respect to the common interest doctrine. And therefore, the other obligations inherent in that special relationship that the court described and on which it based that decision would police the discovery so that you would have good faith obligations, you would have the defense obligation, obligations that would constrain the abuse of the waste management protection, the discovery provisions, and we don't have that here. Did the foundation submit the documents to the court for an in-camera review? Not the documents that are in dispute. Wouldn't that be an option? Well, it's not really a question of whether they are privileged or not at this stage. I mean, if there's a disturbance. I mean, in terms of the danger to the foundation with respect to the merits of your arguments here today, would it be advisable for a court to review those documents in light of your contentions? I think it would be a lot to ask of a court, of the circuit court, to anticipate how they might be misused in the underlying case. The underlying case is extremely complicated. There are very aggressive lawyers on the other side. But you could make those arguments to the trial court who would then review the documents in light of your arguments. It's a possibility. I think it would be very difficult. As a trial lawyer, I had several cases where we had to submit voluminous documents to the trial court in order to protect privilege, other issues, ongoing investigations. And that equips the trial court with the knowledge to apply the doctrine so that it protects both parties and allows the case to go forward. I think it would be a lot to ask of the circuit court to get its mind around the scope and complexity of the underlying case. I know Judge Folkertory made a comment that he's only going to be around for another six years. But is six years long enough? Well, I don't know. I mean, it's a question of the time he's got from his docket and so forth. So if that was the only thing he was doing, certainly. But I think that's still a lot to ask. Well, it seems to me, in looking at the record, that he was ready, willing, and able to do anything that would assist the parties in getting this litigation to a conclusion. Right? Now, in the underlying litigation, it seems that Foundations has been successful in getting a number of counts dismissed. That's right. Is that correct? And doesn't that point to the fact that Gallagher's affirmative defenses may be unfounded in the end? Well, that is the subject of our motion for summary judgment. But the trial court refused to hear that until the end of the discovery, which puts us in a situation now where the discovery would go forward, create the prejudice, and then we would have the opportunity to try to argue that it should not have gone forward because of the developments in the underlying case. I think that's unfortunate. But that's where we are today. So it's not that he has denied it. He's just failed to hear it. He has declined to hear it. He said he didn't want to hear it, and he assumed that Gallagher would insist on discovery. They have never spoken on that issue. But that was his assumption, and so he declined to move forward with that summary judgment motion, which we think would provide a path forward. Go ahead. You can finish your thought. My request really is simply that the court reverse both decisions of the circuit court and direct the court to status action until the conclusion of the LVL litigation. We also ask that the court vacate the circuit court's contempt order. We decline to comply with the court's order simply to perfect this good-faith appeal. Thank you. Thank you. Mr. Layden. Good morning, Your Honors. Mike Layden on behalf of Arthur J. Gallagher. May it please the Court. The trial court correctly determined that Gallagher shares a common interest in defeating the LVL litigation given that Gallagher may bear the ultimate burden of paying the indemnity and defense cost for the LVL litigation. Because the foundations and Gallagher share a common interest in defeating the LVL litigation, the trial court properly ordered the foundations to produce to Gallagher documents exchanged between the foundations and their counsel related to the defense of the LVL litigation. Counsel, the common interest doctrine is usually applied where there is a duty to cooperate, and that we've seen is usually in the relationship between an insurer and an insured. But where is that here? The nature of this contract is it's a compensation agreement, right? Correct. So how is that still applicable given the nature of this contract? So I think there's two issues there, Your Honor. Number one, the Supreme Court identified two exceptions to the attorney-client privilege. First, where there's a duty to cooperate, and second, where there is a common interest. The Supreme Court described the common interest doctrine as a equally compelling and separate basis. And this Court, in Allianz v. Guyton, described the common interest doctrine as a separate basis, separate from the duty to cooperate, described it as a second and independent basis. And to answer your question about the contract, the contract at issue here is a compensation agreement between the parties. You're correct. It has an indemnification provision, making us the indemnitor for the foundations, potentially as a result of the claims in the lawsuit. So at the end of the day, we may be on hook for the $25 million that they're seeking in this case due to that indemnity provision. And so just like there's a Northern District case, Abbott v. Alpha Graphics, where the Northern District, applying the common interest doctrine in a non-insurer situation, determined that because Abbott had that indemnitor relationship with Alpha Graphics for certain products that it provided, and for which Alpha Graphics was, excuse me, Alpha Therapeutics, excuse me, was being sued in products liability claims, that because they shared this common goal of defeating that litigation, Abbott had the responsibility and bore that responsibility, and thus there was this shared commonality of interest such that the common interest doctrine applied, and that the communications between Alpha Therapeutics' counsel in the products liability action should be provided to Abbott. What happens if the defense costs exceed, or what happens when? I'm assuming it's already been going on for some time. It doesn't look like it's going to finish soon. What happens if the defense costs actually exceed the $25 million limit? Does that common interest expire then? I don't think it's such an issue, the common interest expiring. Our liability is capped at the $25 million. But to be clear, Judge Polkjoy limited in his order documents up to the date of this case, so we don't continue to get the documents going forward. Should you get all the documents? What about the coverage documents, documents discussing coverage? Your Honor, we don't get those. Judge Polkjoy said we don't get that, and I think there is a decision in Illinois, Amasco, that says that the documents where they're talking about their coverage issues, we don't get. We only get their communications between them and their counsel relating to the defense of the LBO litigation where we share the common interest. So the foundations have offered several arguments for why they contend that waste management's common interest doctrine does not apply. None of these arguments frankly has merit. The foundations first argued at the trial court level that waste management's exception to the attorney-client privilege only applies in the context of insurers and insurance. The trial court correctly noted that efforts to restrict waste management's application to the context of an insurer-insurer dispute have been rejected time and again by courts. The First District Appellate Court in Board Warner v. Kuhlman explicitly rejected that, finding in that case, and that was a case just like this, with an indemnity-indemnity relationship. And then there are federal, there are also federal cases, as I mentioned, the Abbott Alpha Therapeutics. In their opening brief on appeal, the foundations argued that the trial court erred in applying waste management because of the absence of a contractual duty to cooperate. It was addressing that point with Justice Zenoff that the waste management's made clear that the common interest doctrine is a separate, second, independent basis. At the end of the day, the trial court on the waste management issue correctly found that we share a common interest because Gallagher bears potential liability under our contract with them, just like an insurer would do. In fact, the appellate court in the prior decision in this case said we basically step into the shoes of the insurer. How could those documents be protected? So I think they're protected in a couple different ways, Your Honor. First, we have a protective order in place that the parties agreed to and that the court entered, and under principles of comedy, as we set forth in our brief, made clear that they have to come first to the trial court to get relief from that. They can't go to a federal court to make an end run. There's multiple cases. They have no case that's just to the contrary. Secondly, and I think this is very important, the appellate, this court in Allianz, made clear in interpreting waste management that just because the documents lose their privileged status as to us, they do not lose their privileged status to anybody else. So they remain privileged from everybody else in the world. In other words, the LBO litigants can't get their hands on it, and they remain privileged as to them. So in that sense, they're protected. What if a federal judge in New York thinks otherwise? So a federal judge, well, I think, number one, a federal judge, it doesn't change the situation. In other words, a federal judge can make a party in the LBO litigation could seek the disclosure of the documents from the foundations. But that's the analysis that the court has to do there no matter what, and separate from this case. That's, you know, they have to make the privilege analysis in that case, and they don't share a common interest like we do. Well, their argument is that a trial court in New York, a district court, could say the appellate court in Illinois misconstrued the common interest doctrine, and the privilege is waived. I mean, that's the argument. I understand that's their argument, Your Honor, but if a federal court was analyzing this, they would read the waste management decision in Allianz, and they would see it's not waived. It's just an issue between us and the foundations. There's no basis to argue waiver in that situation. Well, I mean, not that I don't give federal courts a great deal of credit, but they rarely give us a great deal of credit, meaning state courts, and they can say anything they want to if that federal judge thinks that giving these documents up will somehow help the litigation there. My point, Your Honor, is that if a litigant in LBO litigation wants to make a challenge to the privilege documents, they can do that. The resolution of the issue here doesn't change that. It doesn't affect a waiver. And under principles of comity, any dispute, you know, these documents are not only protected by privilege but also by Judge Popejoy's protective order. Any dispute regarding the applicability of Judge Popejoy's protective order is supposed to be determined under principles of comity that apply to federal courts as well. We cite Hall v. Spring Spectrum. In that case, the plaintiffs were required to seek modification of the protective order from the Illinois court to use the documents in a South Carolina action. Similarly, in Donovan-Linowski, a federal court case, the court ruled that principles of comity and respect compelled the district court to quash a subpoena seeking disclosure of confidential privilege documents subject to the state court's protective order. If I could, I'd like to briefly turn to the motion to stay issues. The foundations concede as they must that the trial court's decision denying their motion to stay cannot be overturned unless they show the trial court abused its discretion in denying their request for a stay. The foundations cannot and did not make that required showing. Rather, the record unequivocally shows that the trial court carefully assessed the traditional factors that trial courts are supposed to look at, including judicial autonomy, the orderly administration of justice, and balanced the competing concerns of the party in making this decision. After thoroughly considering these factors and balancing the interests of the parties, the trial court denied the foundation's request. The trial court's denial of the stay is supported for numerous reasons. First, the stay protects Gallagher's important need to pursue discovery in a timely fashion to prevent evidence from becoming stale, memories fading, and witnesses becoming unavailable. As the trial court previously noted, the LBO litigation may last with appeals 15 to 20 years. Indeed, after eight years of litigation, the LBO litigation is still stuck in the pleading stages. There's pending motions to dismiss. That case is going to go on for another 10, 20 years easily. In Crane v. Lucent, the Fifth District appellate court case, the appellate court affirmed the denial of a motion to stay a state court case in favor of a related federal court action, where the federal court action was besieged by motions and not progressing, as has been the case here with respect to the LBO litigation. Second, the record shows that the trial court was mindful of the foundation's concern of overlapping issues. To address that concern, the trial court assured the foundations that it had no intention, no intention of deciding any issue that overlaps with issues in the LBO litigation. How is that possible, that it can make that assurance? Your defenses do acknowledge at least one of your defenses overlaps, correct? Your Honor, you're correct. There's one defense, our uninsurability defense, that has some degree of overlap with claims in the LBO litigation. But he's made clear that if we get up to the point of summary judgment or trial, he's not going to resolve those issues. He's concerned, and he's properly taken into account their concerns about that, and he's not going to put them in a situation of a risk of race judicata or the like. So all he's doing is simply permitting us to engage in discovery on these issues. How did he get past State Farm in coming to his resolution, his conclusion? I think, Your Honor, he got past State Farm because in State Farm, in that case, a default judgment had been entered in the underlying action, and they were basically at the prove-up stage, the final stages of the case. And as the record reflects, what Judge Polkjoy said is the facts of that case, which is the Pell Court district decision says that, you know, under the unique circumstances of that case that we're going to stay at, what Judge Polkjoy found is the factual circumstances here are vastly different. They're far different, I think, were the words he used. And the reason they're different, Your Honor, is because here we face another 8, 10, 12-plus years before we'll ever be able to get to discovery, whereas in the State Farm case, they were in the final stage, the final act of that case going to prove-up, and so they would be quickly moving to the declaratory judgment action. And as we pointed out, the fact that a trial court judge finds that the case before him or her is factually distinguishable from an authority is not a basis on which to find that the court somehow abused its discretion. Third, staying in this case would not further principles of judicial economy or the orderly administration of justice. These are factors that the courts are to consider in assessing their request for a stay. Contrary to the Foundation's argument, Gallagher's affirmative defenses would not be mooted, even if the Foundations are successful in achieving the dismissal of all counts against them in the LBO litigation. For example, Gallagher's contributory negligence and fortuity defenses allege that the Foundations were aware that they would likely be named as defendants in the LBO litigation during the insurance renewal process, yet failed to provide that material and important information to Gallagher while Gallagher was advising. The question of when the Foundations knew they would likely be sued is not something that the LBO litigation will address, let alone decide, as there's no cause of action that deals with that issue. As such, staying in discovery here will only greatly prejudice Gallagher's ability to defend itself against a $25 million claim and resolve this case being litigated 10, 12 years from now. The Foundation's argument largely rests upon case law that applies to declaratory judgment actions between insurers and insureds, and that all emanates from the Supreme Court's seminal decision in Maryland Casualty v. Peppers. The Peppers Doctrine isn't applicable here. The Peppers Doctrine and its progeny do not hold that the presence of overlapping issues means that discovery must be stayed. To the contrary, the Peppers Doctrine simply provides that it's generally not appropriate in a declaratory judgment action for the court to decide issues of ultimate fact. The trial court's made clear that he's not going to do that as it relates to any overlapping issue, so we don't have a Peppers issue here. Now, in their briefs, they cite to two, I think recognizing, tacitly, that the Peppers Doctrine cases simply don't apply. So they try to cite to two professional negligence cases, In Re's State of Balance and Chalipsky. Neither of those cases have any application here. And to be clear, neither of those cases stand for the proposition that just because there's an overlapping issue, that that means discovery must be stayed. Thank you. I'm sorry. How many affirmative defenses have been raised? We have, I believe, and I apologize if I get this wrong, but I believe five off the top of my head. And could you generally just tell me what they are? This record is voluminous. Yes, ma'am. We have a contributory negligence affirmative defense, which has no overlapping issues. We have our fortuity defense, which has no overlapping issues. We have a disclaimer affirmative defense, which has no overlapping issues. We have a statute of limitations issue that has no affirmative defense that has no overlapping issues. And then finally, we have our uninsurability defense under the Ryerson line of authority. That's the one defense that has some potential overlap. And you don't believe, just looking at those in as their plan, that there are overlaps that could be drawn? I do not believe that with the other four, I believe there's no overlap. For example, contributory negligence and fortuity. That was the one I was most concerned about, contributory negligence. The issue of contributory negligence is a question of when did the foundations knew they were likely to be sued in the LBO litigation? None of the causes of action, the breach of fiduciary duty, the fraudulent conveyance, unjust enrichment, none of those cases has as an element when the foundations knew they were going to be sued. That's not an issue in those cases. They don't care about that. The question is their conduct, not what they knew and when they knew. And it's this court here that's particularly suited to do that, because it's this court that has these parties before it. Is there? It's just the same. All right. If I just respectfully request, Your Honor, that this court affirm the trial court's decision both on the denial of the stay and the application of the common interest doctrine. Thank you. Thank you for your time. And Mr. Schoenfeld. Thank you, Your Honors. In answer to a question on State Farmers, the trial court expressly recognized that this case would have to be stayed eventually before these issues would be tried. And I don't see how the court got around that. In fact, that is one of the grounds on which the stay was issued in State Farm, because of that recognition on the part of the trial court that the case would have to be stayed. And the court is right about that. The overlap of issues here would be intensely prejudicial to the foundations, because the issues that Gallagher seeks to pursue involve intent and knowledge that lie at the very allegations of intent and knowledge, that lie at the very heart of the trustees' case against the foundations. But the issue of when, and the argument is that the issue of exactly when the foundations knew is not an issue. You know, it's not as simple as was presented a moment ago. One of the arguments that Gallagher has suggested, and we quote this in our brief, is that they want to argue that because the foundations, as alleged by the trustee, knew that the transaction would result in the bankruptcy of Tribune Company, they therefore knew that they would be sued. And that gets you right into the trustees' allegations. They didn't make that argument. They simply focused it on the object of fact of when the claim came in or something of that nature. We would not have that issue. But they're not being entirely straightforward when they say that they're only focused on the object of fact of when we know that we would be sued. Because they go back to these issues. But the fact remains, while you're right, there may have to be a stay eventually because the trial court has committed to not interfering with the LVO litigation in any way. Why can't we then proceed to get ready for that point in time? Because of the potential. Remember, we're not just talking about disclosure of documents. We're talking about depositions of witnesses about their memories of these events. It would take place in this case long before the depositions would take place in the underlying case, before the expert analysis has been prepared on these complicated financial projection issues and so on that are at the heart of these intent issues. You would be jumping the gun, forcing our witnesses to testify to those things before that evidence is developed on those issues that would be at the heart of the trustees' case in this case before those issues are properly developed in the underlying case and therefore putting them at risk of giving testimony on an incomplete record that then could result in collateral estoppel here if the court goes ahead, but in any event could result in disclosure and all of the prejudice that I described a moment ago. And so even proceeding with the discovery here because of the undeniable risk that the federal court could decide that this testimony given in this case could be used in that case would put the foundations at substantial risk of prejudice that could exceed the amount of the coverage that is at issue in this case. Well, notwithstanding that federal litigation is, as you say, in the pleading stages as opposed to anything much beyond that, are you telling me that they haven't done anything else other than just try to attack pleadings in that case? Not at all. Not at all. There's been a large amount of documents produced, and the expert development is underway. It's simply that we're not ñ depositions would start in a matter of months in this case. They will not start in ñ they may start in a matter of months and not completely conclude in a matter of months in that case. And so there's no question that this case, because of its much narrower focus, would outrun the other case in creating, you know, the prejudice as a result of discovering the overlapping issues in this case prior to their development in the underlying case, notwithstanding the fact that it would affect the defense in the underlying case. Counsel indicated that he didn't think the Peppers Doctrine applied here, does it? The Peppers Doctrine doesn't apply qua Peppers Doctrine, but the concerns reflected in the Peppers Doctrine are very much present here and, as we noted in our brief, have been acknowledged in non-insurance cases, the cases that Mr. Leighton referred to, as governing those cases as well. So it's ñ although the Peppers Doctrine per se doesn't apply, the concerns still exist. It's the same type of issue that would be decided in a declaratory judgment action? Precisely. I mean, it's the same ñ just as you would not permit the discovery of an intentional axe defense in a declaratory judgment action for the same reasons, that discovery and litigation should not go forward here. Let me address very briefly the ñ Go ahead. Thank you. The common interest doctrine. No Illinois appellate court has ever extended the common interest prong of the waste management decision outside of its insurance coverage origins. The Borg case Mr. Leighton referred to involved a cooperation clause, but as Mr. Leighton concedes, there is no cooperation clause in this case. This case was decided in the circuit court on the common interest doctrine, common interest principle or rationale, and that has never been extended by any court beyond the insurance coverage area. And the reasons for that are that the mutual benefit that's described by the court doesn't exist here because you don't have ñ because the other didn't pay the insurance, didn't direct ñ I'm sorry, didn't pay the counsel from which they seek discovery. They didn't direct their actions. They didn't compensate them, and they had only a coincidental interest in their success. And in addition, the very fact that Gallagher was pursuing the discovery on the intent and knowledge issues at the moment when it would most be prejudicial to the foundations demonstrates clearly that there is no common interest at work here, and that's why this case is so different from the insurance cases because no insurer would subject its insurer to that kind of risk. Thank you. All right. Gentlemen, thank you very much for your argument this morning, especially Mr. Leighton for being here. We understood the motion, but we have some urgency in trying to get this resolved as well, so we appreciate your presence, and we will take the matter under advisement. There will be a decision rendered in due course.